IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


RICHARD D. BOUTON,                    )
                                      )
                    Plaintiff,        )
                                      )
vs.                                   )        Case No. 07-4039-JAR
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of                       )
Social Security,                      )
                                      )
                    Defendant.        )
_____)


RECOMMENDATION AND REPORT


     This is an action reviewing the final decision of the
Commissioner of Social Security denying the plaintiff disability
insurance benefits and supplemental security income payments.
The matter has been fully briefed by the parties and has been
referred to this court for a recommendation and report.

**I.  General legal standards**

     The court's standard of review is set forth in 42 U.S.C.
§ 405(g), which provides that "the findings of the Commissioner
as to any fact, if supported by substantial evidence, shall be
conclusive."  The court should review the Commissioner's decision
to determine only whether the decision was supported by
substantial evidence and whether the Commissioner applied the

correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such evidence that a reasonable mind might accept to support the conclusion.  The determination of whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it really constitutes mere conclusion.  Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).  Although the court is not to reweigh the evidence, the findings of the Commissioner will not be mechanically accepted.  Nor will the findings be affirmed by isolating facts and labeling them substantial evidence, as the court must scrutinize the entire record in determining whether the Commissioner's conclusions are rational. Graham v. Sullivan, 794 F. Supp. 1045, 1047 (D. Kan. 1992).  The court should examine the record as a whole, including whatever in the record fairly detracts from the weight of the Commissioner's decision and, on that basis, determine if the substantiality of the evidence test has been met.  Glenn, 21 F.3d at 984.

The Social Security Act provides that an individual shall be determined to be under a disability only if the claimant can establish that they have a physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial

2

gainful activity (SGA).  The claimant's physical or mental impairment or impairments must be of such severity that they are not only unable to perform their previous work but cannot, considering their age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d).

The Commissioner has established a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or non-disability can be made, the Commissioner will not review the claim further.  At step one, the agency will find non-disability unless the claimant can show that he or she is not working at a "substantial gainful activity."  At step two, the agency will find non-disability unless the claimant shows that he or she has a "severe impairment," which is defined as any "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled.  If the claimant's impairment does not meet or equal a listed impairment, the inquiry proceeds to step four, at which the agency assesses whether the claimant can do his or her previous work; unless the claimant shows that he or she cannot perform their previous work, they are determined not

3

to be disabled.  If the claimant survives step four, the fifth and final step requires the agency to consider vocational factors (the claimant's age, education, and past work experience) and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. Barnhart v. Thomas, 124 S. Ct. 376, 379-380 (2003).

The claimant bears the burden of proof through step four of the analysis.  Nielson v. Sullivan, 992 F.2d 1118, 1120 (1993). At step five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in the national economy.  Nielson, 992 F.2d at 1120; Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993).  The Commissioner meets this burden if the decision is supported by substantial evidence. Thompson, 987 F.2d at 1487.

Before going from step three to step four, the agency will assess the claimant's residual functional capacity (RFC).  This RFC assessment is used to evaluate the claim at both step four and step five.  20 C.F.R. § 404.1520(a)(4); 404.1520(f,g).

## II.  History of case

On June 30, 2006, administrative law judge (ALJ) Jack R. Reed issued his decision (R. at 14-25).  Plaintiff alleged that his disability began January 1, 2001 (R. at 14).  Plaintiff last met the insured status requirement for disability insurance on June 30, 2004 (R. at 16).  At step one, the ALJ found that

plaintiff had not engaged in substantial gainful activity
subsequent to January 1, 2001 (R. at 16).  At step two, the ALJ
determined that plaintiff's impairments of borderline
intellectual functioning, an affective disorder with anxiety-
related features, mild disc space narrowing of the lumbar spine,
and a history of intermittent gastric reflux, in combination,
impose more than minimal limitations upon his ability to perform
basic work-related activities and are therefore severe (R. at 18-
19).  At step three, the ALJ determined that plaintiff's
impairments do not meet or equal a listed impairment, including
listed impairment 12.05C (R. at 19-21).  After establishing
plaintiff's RFC, the ALJ found at step four that plaintiff is
capable of performing past relevant work as a dishwasher (R. at
24-25).  In the alternative, at step five, the ALJ found that
plaintiff could perform other work in the national economy based
on the framework of the Medical-Vocational Rules (R. at 25).
Therefore, the ALJ concluded that plaintiff was not disabled.

**IV.  Did the ALJ err in his finding that plaintiff's impairments
do not meet or equal listed impairment 12.05C?**

Plaintiff has the burden at step three of demonstrating,
through medical evidence, that his/her impairments meet all of
the specified medical criteria contained in a particular listing.
Riddle v. Halter, 10 Fed. Appx. 665, 667 (10th Cir. March 22,
2001).  An impairment that manifests only some of those criteria,

no matter how severely, does not qualify. <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530, 110 S. Ct. 885, 891 (1990). Because the listed impairments, if met, operate to cut off further inquiry, they should not be read expansively. <u>Caviness v. Apfel</u>, 4 F. Supp.2d 813, 818 (S.D. Ind. 1998).

The ALJ is required to discuss the evidence and explain why he found that the plaintiff was not disabled at step three. This court should not properly engage in the task of weighing evidence in disability cases. The court's function is only to review the Commissioner's decision to determine whether his factual findings are supported by substantial evidence and whether he applied the correct legal standards. In the absence of ALJ findings supported by specific weighing of the evidence, the court cannot assess whether relevant evidence adequately supports the ALJ's conclusion that the plaintiff did not meet or equal any listed impairment. <u>Clifton v. Chater</u>, 79 F.3d 1007, 1009 (10th Cir. 1996).

Plaintiff argues that his impairments meet or equal listed impairment 12.05C. Listed impairment 12.05C is as follows:

> 12.05 *Mental retardation:* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A,

6

> B, C, or D are satisfied....
>
> C.  A valid verbal, performance, or full
> scale IQ of 60 through 70 and a physical or
> other mental impairment imposing an
> additional and significant work-related
> limitation of function.

20 C.F.R. Subpt. P., App. 1 at 479 (2007 at 500-501).

The ALJ relied on the medical evidence from Dr. Ohlde, Dr. Adams, treatment notes from Valeo Behavioral Healthcare, and the testimony of Dr. Golon to find that plaintiff's impairments do not establish mental retardation, noting that all these medical sources diagnosed or indicated only borderline intellectual functioning.  Furthermore, according to the ALJ, the evidence did not establish the requisite degrees of deficits of adaptive functioning manifested prior to attainment of age 22, and therefore concluded that the specific severity requirements of 12.05C are not met (R. at 20-21).

On August 9, 2004, Valeo Behavioral Health Care conducted an intake assessment on the plaintiff (R. at 248-251).  Under significant history, the assessment stated, in relevant part:

> His reporting was somewhat clouded by
> borderline intellectual functioning...He
> completed high school in special
> education...He could not remember being
> labeled with mental retardation, but his use
> of words, his vocabulary and memory problems
> seemed to have put him in the Borderline
> Intellectual Functioning classification.

(R. at 249).  Later, in the summary, the report stated:

> It did not appear however, that his mental

7

health issues would preclude him from work.
Treatment would seem to enhance his ability
to work.  However, this evaluation did not
make any judgements of...a possibility that
he may test within the Mentally Retarded
classification.

(R. at 251).  Under staff recommendations for treatment, special

needs and considerations, the report stated: "Borderline

Intellectual Functioning and some problems in memory" (R. at

251).

Dr. Carroll Ohlde, a psychologist, performed an intellectual

assessment on the plaintiff, meeting with him on August 31, 2004

(R. at 146).  Dr. Ohlde's report indicated that plaintiff

completed the 12th grade attending special education classes.

Dr. Ohlde noted that plaintiff had been employed for periods of

two or three months as a dishwasher, and had been let go because

they said he was too slow.  Plaintiff is married, but getting a

divorce.  Dr. Ohlde observed that plaintiff responded

intelligibly to questions, was friendly and cooperative, provided

appropriate details regarding his background, emotional concerns,

health problems, and current life situation.  Plaintiff responded

coherently to questions and stayed on track as he performed

mental status tasks.  Plaintiff was oriented to person, place and

time.  Plaintiff reported he mostly sits around the house, spends

some time with his girlfriend, goes to the store with his mother

and cooks sometimes.  He is able to drive, but is scared to do so

since his brother was killed in an automobile accident.

8

Plaintiff drove himself to the appointment with Dr. Ohlde.
Plaintiff stated he managed his money adequately and is able to
do self-care (bathing, dressing & grooming) and instrumental
activities of daily living (cooking, cleaning & shopping), with
limitations caused by health problems and bad days with decreased
motivation, energy, and concentration.  Plaintiff indicated he
has regular contact with his parents and girlfriend, cousin, and
a few friends.  Dr. Ohlde stated that given plaintiff's "adequate
attention and fair math abilities," he can probably handle his
own finances with some possible need for some assistance from one
of his parents for more complex financial transactions (R. at
146-148).

Intellectual testing indicated a full scale IQ of 69, a
verbal IQ of 72, and a performance IQ of 70 (R. at 147).  Dr.
Ohlde stated that:

> His accumulated verbal learning (Vocabulary),
> verbal (Similarities) and nonverbal (Matrix
> Reasoning) abstract reasoning abilities, and
> visual memory and attention to detail were in
> an extremely low range.  His other cognitive
> abilities were in a borderline to low average
> range.  During the WAIS-III assessment he had
> no difficulty understanding and following
> directions and made an adequate effort in
> responding to assessment tasks.  Thus, his
> test results are probably a valid indication
> of his current intellectual functioning.
> Based on history (see Past History-Medical)
> and interview observations, his test results
> probably reflect borderline intellectual
> functioning rather than mild mental
> retardation.

(R. at 147).

Dr. Carol Adams, a psychologist, reviewed the case file and filled out psychiatric review technique forms on September 13, 2004 (R. at 156-184); her findings were affirmed by Dr. Lauren Cohen, a psychologist, on December 8, 2004 (R. at 156, 170, 171). Dr. Adams indicated that the intake evaluation at Valeo made an initial diagnosis of BIF (borderline intellectual functioning). Dr. Adams noted the IQ scores, but also noted that Dr. Ohlde found that the test results reflected BIF. After summarizing the evidence, Dr. Adams concluded by stating that plaintiff "does appear to function within the BIF range given his IQ scores, his adaptive functioning, education, and capacity for SGA [substantial gainful activity] earnings" (R. at 168), and further concluded that plaintiff's impairments are severe but "do not meet or equal a listing" (R. at 168). Dr. Adams opined that plaintiff was capable of performing "simple, routine tasks in a competitive work environment" (R. at 153).

At the hearing, Dr. Golon, a board certified psychologist, testified. Relevant portions of his testimony included the following:

> He attended special ed his entire life and IQ
> testing was done at this time that showed him
> to have an IQ ranging from 69 to 72.
> However, they did feel that, although this is
> a valid test, that based on his history and
> interview observations, the test results
> probably reflect borderline intellectual
> functioning rather than mild mental

retardation.  Even though the full scale is
69 and the performance was 70...the only
diagnosis was the borderline intellectual
functioning.  At this time he also had an
evaluation from the mental health
center[1]...At that time they noted the
multiple depressive symptoms, problems with
poor concentration and poor memory, secondary
to his borderline intellectual functioning...

However, on page 28, they do state it did not
appear that his mental health issues would
preclude him from work.  Treatment would seem
to advance his ability to work...And, once
again, at that time his GAF was 41 and his
diagnosis was the borderline intellectual
functioning.

(R. at 277, 278, 279).  Dr. Golon later testified that:

So, in summary, I feel he does suffer
from...a borderline intellectual
functioning...However, either singularly, or
in combination, he does not appear to meet or
equal a listing...he appears to maintain the
MIFC for simple, unskilled, low stress,
repetitive work.

(R. at 280).  On cross-examination by plaintiff's attorney, Dr.

Golon further testified:

But once again, the evaluation and the
testing by the psychologist, Dr. [Ohlde], you
know, do indicate that in taking into account
his functioning and his presentation, they
feel he really suffers more from borderline
intellectual functioning rather than mild
mental retardation.  That's why we're, we're
putting it under 12.02 [organic mental
disorders], but many states put it under
12.05.  Either way, the impairments would
remain the same.

---

[1]Dr. Golon was referring to Exhibit 8F, which was the
evaluation from Valeo Behavioral Health Care (R. at 278).

(R. at 281).

Plaintiff argues that because he had a valid performance IQ score of 70 and a full scale IQ score of 69, and met the other requirements of 12.05C, he should have been found to have met listed impairment 12.05C.  Defendant argues that, despite the fact that two of the IQ scores fell between 60-70, the ALJ could properly rely on the diagnosis of Dr. Ohlde and other psychologists that plaintiff's proper diagnosis was borderline intellectual functioning rather than mild mental retardation to justify a finding that plaintiff's impairment did not meet listed impairment 12.05C.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(D)(6)(a) states the following concerning intelligence tests:

> The results of standardized intelligence tests may provide data that help verify the presence of mental retardation or organic mental disorder, as well as the extent of any compromise in cognitive functioning. **However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.**

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(D)(6)(a) (2007 at 497)(emphasis added); Lax v. Barnhart, 489 F.3d 1080, 1087 (10th Cir. 2007).

In defining mental retardation in listed impairments 12.05,

the Commissioner did not adopt the definition of mental
retardation found in the <u>Diagnostic and Statistical Manual of</u>
<u>Mental Disorders</u> (DSM-IV) published by the American Psychiatric
Association (APA).  However, the definition of mental retardation
used in the listings "is consistent with, if not identical to,"
the various definitions of mental retardation used by the leading
professional organizations.  67 Fed. Reg. 20018 at 20022 (Apr.
24, 2002).   While all the definitions (of the four major
professional organizations in the United States that deal with
mental retardation) require significant deficits in intellectual
functioning, as evidenced by IQ scores of approximately 70 or
below, age of onset and the method of measuring the required
deficits in adaptive functioning differ among the organizations.
The definition of mental retardation used by the Commissioner in
the listings is not restricted to diagnostic uses alone, nor does
it seek to endorse the methodology of one professional
organization over another.  "While capturing the essence of the
definitions used by the professional organizations," it is also
used to determine eligibility for disability benefits.  67 Fed.
Reg. 20018 at 20022 (Apr. 24, 2002).

     According to the DSM-IV, borderline intellectual functioning
describes an IQ range that is higher than that for Mental
Retardation (generally 71-84).  Mild mental retardation describes
an IQ of 50-55 to approximately 70.  There is a measurement error

of approximately 5 points in assessing IQ, although this may vary from instrument to instrument.  Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior.  Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.  Differentiating Mild Mental Retardation from Borderline Intellectual Functioning requires careful consideration of all available information.  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) (4th ed., text revision, American Psychiatric Association, 2000, at 41-42, 48, 49).

The assessment by Valeo Behavioral Health Care placed plaintiff in the borderline intellectual functioning classification, but did not rule out a possibility that plaintiff could test within the mentally retarded range.  Dr. Ohlde, who performed the IQ tests on plaintiff, noted that the test results were probably a valid indication of his current intellectual functioning, and then stated that based on history and interview observations, plaintiff's test results probably reflect borderline intellectual functioning rather than mild mental retardation.  Three psychologists who reviewed the report from Dr. Ohlde (Dr. Adams, Dr. Cohen, and Dr. Golon) also concluded that plaintiff functions within the borderline intellectual

14

functioning range, and further opined that his impairment does
not meet or equal a listed impairment.

The regulations clearly state that the results of IQ tests
are only part of the overall assessment to determine the presence
of mental retardation.  The narrative report that accompanies the
test result should comment on whether the IQ scores are
considered "valid and consistent with the developmental history
and the degree of functional limitation."  20 C.F.R. Pt. 404,
Subpt. P, App. 1, §12.00(D)(6)(a)(emphasis added).[2]  As noted in
the DSM-IV, mental retardation would not be diagnosed in an
individual with an IQ lower than 70 if there are no significant
deficits or impairments in adaptive functioning; furthermore,
differentiating between mental retardation and borderline
intellectual functioning requires careful consideration of all
available information.  Dr. Ohlde and Dr. Golon indicated that
the test was valid (R. at 147, 277), but also indicated that the
history, interview observations, and test results together
reflected borderline intellectual functioning rather than mild
mental retardation (R. at 147, 277-78).  Dr. Golon further
testified that, "taking into account his functioning and his
presentation" he suffers more from borderline intellectual

_____

[2]The Commissioner is not required to make a finding of
mental retardation based on the results of an IQ test alone.
Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986); cited with
approval in Lax v. Astrue, 489 F.3d at 1087.

functioning rather than mild mental retardation (R. at 281).  Dr. Adams and Dr. Cohen indicated that plaintiff appears to function in the borderline intellectual functioning range given his IQ scores, adaptive functioning, education, and capacity for substantial gainful employment (R. at 168).

Thus, although there is no dispute as to the validity of the IQ test performed on plaintiff, all four psychologists found that plaintiff's history, interview observations and test results were in fact consistent with a functional limitation or finding of borderline intellectual functioning, and were not consistent with a functional limitation of mental retardation.  The assessment from Valeo Behavioral Health Care (prior to the administration of the IQ test) also stated that plaintiff's use of words, vocabulary, and memory problems seemed to put him in the range of borderline intellectual functioning.  Not one psychologist in this case opined that plaintiff's mental impairments meet or equal listed impairment 12.05C, and three of the psychologists expressly opined that plaintiff's impairments do not meet or equal listed impairment 12.05C.[3]

---

[3]Plaintiff cites to the case of Bishop v. Barnhart, 2005 WL 946560 at 2-3, 6 (D. Kan. Mar. 15, 2005), in which the court held that plaintiff's impairment met listed impairment 12.05C.  In Bishop, plaintiff had a full-scale IQ of 70.  Dr. Mintz, who performed the IQ test, diagnosed plaintiff with borderline intellectual functioning.  The court stated that this diagnosis, by definition, does not preclude establishment of the requirements of 12.05C.  In Bishop, Dr. Mintz did not suggest in his report that the IQ score was suspect or invalid.  However, in

Plaintiff argues that the ALJ failed to indicate which one of the measurement methods he used in determining plaintiff's level of adaptive functioning, as called for in the case of Barnes v. Barnhart, 116 Fed. Appx. 934, 939-940 (10th Cir. Nov. 26, 2004). Plaintiff stated that one of the measurement methods is from the American Psychiatric Association (APA), which is contained in the DSM-IV (Doc. 10 at 25). Although the ALJ did not specify any measurement method, the ALJ relied on the findings of the four psychologists to conclude that the medical evidence did not establish the requisite degree of deficits of adaptive functioning initially manifested prior to the age of 22 (R. at 21).[4]

---

Bishop, the court did not mention or discuss 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(D)(6)(a), and specifically the need to determine if the IQ score is consistent with the claimant's developmental history and the degree of functional limitation. There was no indication that Dr. Mintz commented on whether the IQ score was consistent with claimant's developmental history and the degree of functional limitation; nor did the opinion indicate that Dr. Mintz opined whether the evidence established that plaintiff met or equaled listed impairment 12.05C. In the case before the court (Bouton), all four psychologists found that plaintiff's history, interview observations and test results were in fact consistent with a functional limitation or finding of borderline intellectual functioning, and were not consistent with a functional limitation of mental retardation. Three psychologists also opined that plaintiff's impairment did not meet or equal listed impairment 12.05C.

[4]The Fourth, Eighth, and Eleventh Circuits have held that in the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ had remained relatively constant. Thus, an IQ score after age 22 creates a rebuttable presumption of a claimant's IQ before age 22. Luckey v. Dep't of Health & Human Serv., 890 F.2d 666, 668

In the case of Witt v. Barnhart, 446 F. Supp.2d 886, 895

(N.D. Ill. 2006), the court stated:

> According to the Diagnostic and Statistical
> Manual of Mental Disorders (DSM-IV), a manual
> published by one of the professional
> organizations endorsed by the SSA, in order
> to be mentally retarded an individual must
> have significant limitations in adaptive
> functioning in at least two of the following
> skill areas: communication, self-care, home
> living, social/interpersonal skills, use of
> community resources, self-direction,
> functional academic skills, work, leisure,
> health, [and] safety. DSM-IV at 39 [DSM-IV-TR
> at 41].

Plaintiff cited to these criteria set forth in the DSM-IV in his

brief, and argued that there is sufficient evidence to show that

plaintiff had deficits in at least two of these areas,

specifically citing functional academic skills and work history

---

(4th Cir. 1989); Sird v. Chater, 105 F.3d 401, 402 n.4 (8th Cir.
1997); Hodges v. Barnhart, 276 F.3d 1265, 1268-69 (11th Cir.
2001).  The Tenth Circuit has not addressed the issue whether
mental retardation may be presumed to have manifested during the
developmental period.  However, it has noted that circuit courts
have liberally construed the early manifestation requirement
whereby a claimant is not required to affirmatively prove that he
was mentally retarded prior to reaching the age of twenty two so
long as there was no evidence that claimant's IQ had changed.
McKown v. Shalala, 1993 WL 335788, at *3 (10th Cir. Aug. 26,
1993).
    In this case, none of the psychologists state that
plaintiff's IQ scores, obtained after age 22, are not indicative
of plaintiff's IQ before age 22, although Dr. Golon noted the
problem that the IQ testing was not done before age 22 (R. at
280).  There is no evidence in the record of this case, including
the opinions of the psychologists, that plaintiff's functional
limitations or level of adaptive functioning was any different
before the age of 22.  Thus, the only issue in dispute is the
degree of plaintiff's deficits in adaptive functioning.

(Doc. 10 at 25-27).

The ALJ noted, as in Witt, 446 F. Supp.2d at 895, 897, that plaintiff, although taking special education coursework, graduated from high school (R. at 20).  The ALJ noted plaintiff's limited prior employment (R. at 18), but also noted that Valeo Behavioral Healthcare had reported that plaintiff's mental health issues would not preclude him from work (R. at 20, 251).  Based on the record, Dr. Adams opined that plaintiff had the "capacity" for substantial gainful activity earnings (R. at 168), and was capable of performing simple, routine tasks in a competitive work environment (R. at 153).  Dr. Golon opined that plaintiff could engage in simple, unskilled, low stress, repetitive work (R. at 280).  The ALJ, in reviewing plaintiff's demonstrated level of adaptive functioning referenced the "multiple clinical findings reported by Dr. Ohlde" (R. at 20), which included findings that plaintiff could drive, communicate, is able to do self-care and instrumental activities of daily living, has daily or regular contact with parents, a girlfriend, a cousin, and a few friends (R. at 146-148).  All of these findings directly correspond to the skill areas identified in the DSM-IV when assessing whether a claimant has significant limitations in adaptive functioning.

Unlike Barnes, the ALJ in Witt considered the factors and evidence that pertain to an individual's adaptive functioning, as defined in the DSM-IV.  The court in Witt held that the evidence

of deficits in adaptive functioning in that case was much weaker
than in Barnes, and the ALJ's analysis of the evidence was much
stronger than in Barnes.  The court concluded that the ALJ
assessed the proper elements and reached a reasonable and
justifiable conclusion.  Witt, 446 F. Supp.2d at 897.

As in Witt, in the case before the court (Bouton), the
evidence from the psychologists cited to by the ALJ demonstrates
that the ALJ assessed the skill areas set forth in the DSM-IV for
determining a person's limitations in adaptive functioning, and
reached a reasonable and justifiable conclusion that plaintiff
did not have the requisite degree of, or significant, deficits of
adaptive functioning.  The court cannot reweigh the evidence nor
substitute its judgment for that of the agency.  White v.
Barnhart, 287 F.3d 903, 905, 908, 909 (10th Cir. 2002).

Furthermore, there is no medical opinion evidence in the
record that plaintiff has a degree of functional limitation or
deficits in adaptive functioning that meet or equal listed
impairment 12.05C.  Dr. Ohlde, who administered the IQ test on
the plaintiff, commented in his narrative report accompanying the
IQ test that the history, interview observations, and the test
results probably reflected, or were consistent with, borderline
intellectual functioning rather than mild mental retardation.
Three other psychologists agreed with the assessment by Dr.
Ohlde, and thus concluded that plaintiff did not meet or equal

listed impairment 12.05C.  Based on the evidence of record, the court finds that substantial evidence supports the finding of the ALJ that plaintiff's impairment did not meet or equal listed impairment 12.05C.

IT IS THEREFORE RECOMMENDED that the decision of the Commissioner be affirmed.

Copies of this recommendation and report shall be provided to counsel of record for the parties.  Pursuant to 28 U.S.C. § 636(b)(1), as set forth in Fed.R.Civ.P. 72(b) and D. Kan. Rule 72.1.4, the parties may serve and file written objections to the recommendation within 10 days after being served with a copy.

Dated at Wichita, Kansas, on February 12, 2008.

                              s/John Thomas Reid
                              JOHN THOMAS REID
                              United States Magistrate Judge